# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
The premise at 12101 Signal Avenue NE, Albuquerque, )
New Mexico 87122 )

Case No. 21-MR-1669

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2 to the Affidavit attached hereto and incorporated by reference herein

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B to the Affidavit attached hereto and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371 and 922(l) | Conspiracy to illegally import firearms |
| 18 U.S.C. § 922(l) | Unlawful Importation of a Firearm into the United States |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*James A Nugent*
*Applicant's signature*

Special Agent James A. Nugent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____sworn to telephonically._____ *(specify reliable electronic means)*

*Steve Yarbrough*
*Judge's signature*

Date: 11/26/21

City and state: Albuquerque, New Mexico

Steven C. Yarbrough, United States Magistrate Judge
*Printed name and title*

| | |
|---|---|
| **IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR THE PREMISES FURTHER DESCRIBED IN ATTACHMENTS A-1 THROUGH A-5** | **Case No. _____** <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, James A. Nugent, Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, state the following:

## PURPOSE OF THE AFFADAVIT

1.      This is an Affidavit provided in support of an application for a search warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), and Federal Rule of Criminal Procedure 41.   Specifically, I seek a search and seizure warrant authorizing the search of the following:

  a.  207 OLD COORS RD SW, ALBUQUERQUE, NEW MEXICO 87121, JCT Manufacturing, owned and operated by James C. TAFOYA **(Location 1)** as further described in **Attachment A-1**, for the items described in **Attachment B**.

  b.  12101 SIGNAL AVE NE, ALBUQUERQUE, NEW MEXICO 87122, residence of TAFOYA (**Location 2**) as further described in **Attachment A-2**, for the items described in **Attachment B**.

  c.  ███████████████████████████, ████ ████, owned and operated by ██████████ (**Location 3**) as further described in **Attachment A-3**, for the items described in **Attachment B**.

1

d. 8000 PASEO DEL NORTE BLVD NE, STE C6, ALBUQUERQUE, NEW MEXICO 87122, Integrity Firearms, owned and operated by James C. TAFOYA and ▮▮▮▮▮▮ (**Location 4**) as further described in **Attachment A-4**, for the items described in **Attachment B**.

e. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, residence of ▮▮▮ (**Location 5**) as further described in **Attachment A-5**, for the items described in **Attachment B**.

2. The locations listed above, include JCT Manufacturing, referred to as **Location 1,** and the residence of James C. TAFOYA referred to as **Location 2,** ▮▮▮▮▮▮▮ referred to as **Location 3**, and Integrity Firearms referred to as **Location 4**, and the residence of ▮▮▮▮ referred to as **Location 5**, as discussed further in this affidavit, your affiant knows that the abovementioned locations are within the jurisdictional boundaries of the District of New Mexico.

3. Based on the facts described in the following affidavit, I believe James C. TAFOYA, ▮▮▮▮▮▮, ▮▮▮▮▮, and ▮▮▮▮▮ (TAFOYA, ▮▮▮, ▮▮, and ▮▮), have committed the following federal crimes and related offenses, referred to herein as the **Subject Offenses:**

a. Conspired to illegally cause the import of a firearm into the United States in violation of 18 U.S.C. § 371 and 18 U.S.C. § 922(l), and in so doing knowingly made a false statement while applying for an exemption to import regulated firearms, in violation of 18 U.S.C. § 924(a)(1)(A);

b. A violation of 18 U.S.C. § 922(l), the unlawful importation of a firearm into the United States, requires that a person knowingly and unlawfully imported a firearm

into the United States, without authorization or permission of the Attorney General of the United States.

4.     On March 25, 2021, a criminal complaint and warrant of arrest against Sean Reidpath SULLIVAN was authorized by District of Maryland United States Magistrate Judge A. David Copperthite, who found probable cause to believe that SULLIVAN committed violations of 18 U.S.C. § 922(l) and 18 U.S.C. § 545.  The District of Maryland Magistrate Case Number for that matter is 21-844 ADC. On March 29, 2021, search warrants for SULLIVAN'S residence and a storage unit he rented were authorized in Maryland by United States Magistrate Judge Thomas M. DiGirolamo. The Magistrate Case Number for those warrants are 21-mj-926 TMD and 21-mj-927 TMD, respectively. A search warrant was also issued for a portion of a customs bonded warehouse in Dulles, Virginia that SULLIVAN rented. That warrant was signed on March 29, 2021, by the Hon. Theresa Buchanan of the Eastern District of Virginia. The Magistrate Case Number for that warrant is 1:21-SW-195.

5.     On March 30, 2021, the search warrants mentioned above were executed, as was the arrest warrant for SULLIVAN. Following those warrants, investigators began conducting a closer examination into Larry Allen VICKERS and his dealings as a Federal Firearms Licensee. The investigation into VICKERS led to the authorization of a federal search warrant for his residence in Huntersville, North Carolina by United States Magistrate Judge David C. Keesler of the Western District of North Carolina. The Magistrate Case Number for that warrant is 3:21-mj-00197-DCK. That warrant was executed at VICKERS' residence on August 25, 2021, and a wealth of information was gained from its execution, which led agents to begin looking more closely into ███████████, a close friend and business associate of VICKERS and who is, himself, a federal firearms licensee operating under the business name of ███████████████.  The

3

investigation into ▮▮▮▮ led to the authorization of a federal search warrant for his residence in Missouri City, Texas, by United States Magistrate Judge Dena H. Palermo of the Southern District of Texas. The Magistrate Case Number for that warrant is "4:21-mj-2025." The residence doubled as the location where ▮▮▮▮ operated his business, ▮▮▮▮▮▮▮▮▮▮▮▮, as a FFL. The warrant was executed at ▮▮▮▮ residence on September 28, 2021. Based on the information gathered from ▮▮▮▮ residence, investigators began looking more closely into the following FFLs; JCT Manufacturing, owned by James C. TAFOYA, ▮▮▮▮▮▮▮▮, owned by ▮▮▮▮ ▮▮▮▮, and Integrity Firearms, co-owned by TAFOYA and ▮▮▮▮▮▮. These FFLs operate out of **Location 1, Location 3**, and **Location 4**, respectively, in Albuquerque, New Mexico. It is worth noting, that TAFOYA has told investigators that he and ▮▮▮▮ are brothers, and ▮▮▮▮ is a former Industry Operations Inspector for the ATF who recently left the Agency in April, 2021. According to ▮▮▮▮, TAFOYA is a close friend and business associate of his.

6.  Investigators also began to look more closely into ▮▮▮▮▮▮▮▮ of the New Mexico State Police, who is associated with the abovementioned FFLs. ▮▮▮▮ is the current armorer for the state police and, was given authorization to request firearm demonstrations for the New Mexico State Police by former acting Chief Robert Thornton. Investigators also conducted multiple interviews with ▮▮▮▮ which are further described throughout this affidavit.

7.  Investigators also became aware of two additional law enforcement officers throughout the course of the investigation. The first being law enforcement officer number one, from here referred to as LEO 1, with the Bernalillo County Sheriff's Office. According to their website, the Bernalillo County Sheriff's Office encompasses the greater Albuquerque area. Since 2015, the Bernalillo County Sheriff's Office has submitted dozens of request letters, for the demonstration of dozens of firearms through ▮▮▮▮▮▮▮▮ and JCT Manufacturing.

4

8.     The second being law enforcement officer number two, from here referred to as LEO 2, with the Laguna Police Department.  The Laguna Police Department is the law enforcement agency for the Pueblo of Laguna which is a reservation west of Albuquerque, NM.  Since 2020, the Laguna Police Department has submitted multiple requests for the demonstration and possible acquisition of restricted firearms through both ████████████ and JCT Manufacturing.

9.     Investigators noted ostensibly, similarities from documents generated by both the Bernalillo County Sheriff's Office and the Laguna Police Department to other police departments previously identified in the investigation and further explained later in the affidavit.  The similarities include the large quantity of demonstration letters submitted and the types and quantities of firearms requested.

10.     Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of the search warrant requested herein, I have not included every detail of every aspect of the investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause.  I have not, however, excluded any information known to me that would defeat a determination of probable cause.  The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals.  All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

## AFFIANT AND EXPERTISE

11.     I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 U.S.C. § 2516.

12.     Your affiant has been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) since June, 2018.  Your affiant has attended the Federal Law Enforcement Training Center Criminal Investigation Training Program, and the ATF Academy's Special Agent Basic Training Program, both located in Glynco, Georgia, for a combined period of twenty-seven weeks.  Your affiant has received extensive formal, and on-the-job training in the provisions of the Federal Firearms Laws administered under Title 18 and Title 26 of the United States Code.  Your affiant is currently assigned to the Baltimore Field Division, Baltimore Group III, which investigates violations of federal firearms laws, violent crimes, and armed narcotic trafficking.  Your affiant has participated in numerous investigations focusing on controlled dangerous substance (CDS) trafficking, gangs, illegal firearms possession and use, Federal Firearms Licensee violations, murders and non-fatal shootings, public corruption, terrorism, and violations of the National Firearms Act. Your affiant has conducted covert surveillance of CDS traffickers and firearms traffickers; interviewed numerous individuals involved in gangs, the CDS trafficking trade, and the illegal firearms trade; participated in the execution of numerous state and federal search and arrest warrants involving CDS traffickers, firearm traffickers, felons in possession of firearms, and violent offenders; and participated in the seizure of firearms and CDS.

13.     Based on my training, knowledge and experience, I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons who illegally possess, sell, and traffic firearms.  From my training, knowledge, experience, and conversations with other agents and officers, I am also familiar with the techniques employed by persons who

attempt to import, acquire, and resell firearms in violation of the Gun Control Act, the National Firearms Act, and in contravention to federal regulations. I am also familiar with attempts and methods by which these persons attempt to evade detection by law enforcement.

14.    Based on this specialized training and experience, I know that persons involved in the purchase, acquisition, and possession of illegal firearms typically keep and maintain records of their various activities. Such records are regularly concealed in a suspect's residence, storage unit, vehicle, office, and on his person, and that they take various forms. Documents commonly concealed by persons who illegally acquire and possess firearms governed by the Gun Control Act and the National Firearms Act, include but are not limited to: receipts, wired money transactions, hidden bank accounts, various forms of commercial paper, notebooks, records, ledgers, money orders, and other papers relating to the ordering, transportation, sale and distribution of firearms, or other such documents which will contain identifying data on the source of the firearms. Many of these items can also be contained in the form of electronic mail or messages on electronic devices such as tablets and cell phones. The aforementioned items are kept by suspects in locations that are considered safe such as safety deposit boxes, residences, vehicles, and on their person, where they have ready access to them.

15.    I also know that Federal Firearms Licensees (FFL) are required by law to keep and maintain certain records on the premises of their business, and that those records must be truthfully kept and maintained. I know that these records are generally contained in what is known as an Acquisition and Disposition book, in which they are required to keep and maintain a record of whatever firearms they acquire or manufacture, as well as the subsequent disposition of any of those firearms. I also know that sometimes these records can take an electronic format and will be stored in computers, laptops, or tablets located at the business and/or residence. JCT

Manufacturing (**Location 1**), ████████████ (**Location 3**), and Integrity Firearms (**Location 4)** are licensed by the Bureau of Alcohol, Tobacco and Firearms, and are required to keep detailed records of their firearm transactions.

16.     Persons involved in the purchase and acquisition of firearms utilize cellular telephones, laptops, tablets, and other electronic communications devices to facilitate illegal transactions. Call histories and stored numbers as well as stored text messages on cellular phones often contain fruits of the offenses and lead to the identification of the perpetrators and co-conspirators. Email traffic and internet browsing history often contain fruits of the offenses as well as means by which firearms were acquired, as well as payment information and history. The electronically stored information on these devices is of evidentiary value in identifying other members of the trafficking conspiracy and establishing the relationship between these individuals.

17.     Persons involved in the acquisition of illegal firearms often take or cause to be taken photographs of themselves, their associates, their property, and their wares. These persons usually maintain these photographs in their possession, in locations such as their homes, vehicles, electronic devices, or on their person.

18.     Lastly, I know that the process to import firearms into, and export firearms out of, the United States consists of a number of steps, all of which require the appropriate paperwork and documentation. Specifically, and as regards to the involvement of the ATF, I know that the process to import firearms begins with the importer submitting an ATF Form 6 to the ATF for approval. That ATF Form 6 is a forward-looking prospective request by the importer for preliminary approval to import a specific firearm (or firearms) in a specified quantity and for a specified purpose. If the firearm is subject to restrictions limiting it to use by law enforcement agencies or the US Military, then a letter from the law enforcement entity or military agency must also

accompany the ATF Form 6. This law enforcement request letter is generally required to state a need for the firearm (i.e.: use by SWAT Teams, patrol units, etc.); a desire by the requesting agency to test and evaluate the firearm or have it demonstrated for them; and the presumption that the firearms in question are still in production and an order for more of the same firearms could be fulfilled (i.e.: the firearm hasn't been out of production for thirty years and only a small number are still circulating). Assuming everything is in proper order, the ATF Form 6 will be approved by the ATF. When the importer brings the items into the country, they must be declared on an ATF Form 6a, which documents the actual number of firearms brought into the county, as well as the make, model, and serial number of each. Those firearms are deducted from the overall number of firearms approved in the initial ATF Form 6, until either the requested maximum is met, or the ATF Form 6 expires after two years. For each new type of firearm intended for import, a new ATF Form 6 must be completed and approved before the importer can bring the item into the United States. Officials with the Customs and Border Protection service will check for an approved ATF Form 6 before they allow an individual to remove firearms from a Foreign Trade Zone or a Customs Bonded Warehouse if the firearms were imported directly there. The importer is then required to file the ATF Form 6a within fifteen days of import of the weapon(s).

## PROBABLE CAUSE

19.    In the fall of 2020, agents from the ATF, the Department of Homeland Security Office of the Inspector General (DHS OIG), and the Federal Bureau of Investigation (FBI) (collectively, the "Agencies") began investigating Sean Reidpath SULLIVAN for violations of federal law. More specifically, they began looking into SULLIVAN because of his business association with Christopher FIORENTINO of Phoenix, Arizona, who was arrested in October

2020, for a violation of the National Firearms Act (NFA), specifically Title 26 U.S.C. §5861d, possession of an unregistered firearm falling under the regulations of the NFA.

20.     Investigators are aware that SULLIVAN is the owner of Trident LLC, which is a Federal Firearms Licensee (FFL) that represents on its business website that it provides firearms and security products to military and law enforcement agencies in the United States and abroad. TRIDENT LLC is also an importer and exporter of firearms and is known to ATF and DHS.  In January 2021, investigators began focusing on violations of federal law regarding falsified ATF import forms and the smuggling of impermissible weapons into the United States under the pretense that they were, in fact, weapons permitted for import under the military/law enforcement demonstration/use exemption. Agents identified three FFL Licenses in Maryland, one in SULLIVAN's name and the other two under Trident LLC. These licenses grant SULLIVAN and his company authority to sell, manufacture, and distribute firearms that fall under the purview of the Gun Control Act and the National Firearms Act, to include weapons of war. On the paperwork that SULLIVAN had filed with the ATF to acquire an FFL, which was granted in 2014 and updated in 2018, SULLIVAN stated that Trident LLC (as well as the FFL in his own name) would be based out of his residence, located in Maryland.

21.     As mentioned above, what initially led investigators to look at SULLIVAN was the arrest in Phoenix, Arizona, of an individual known as Christopher FIORENTINO, who was charged federally in the District of Arizona with violating Tit1e 26 U.S.C. § 5861d, possession of unregistered firearms falling under the regulations of the NFA. ATF agents in Phoenix became aware that FIORENTINO was using SULLIVAN as an importer for many of the firearms which FIORENTINO was acquiring and reselling to various persons around the country. It should be

noted that while FIORENTINO was selling large quantities of firearms, he was doing so without possessing a Federal Firearms License, in direct violation of federal law.

22.     During a federal search warrant executed at FIORENTINO'S residence[1], agents located numerous invoices in which SULLIVAN and Trident LLC billed FIORENTINO for items SULLIVAN had imported as a result of their business relationship.  In fact, one document referenced the "SULLIVAN/FIORENTINO" partnership and had bookkeeping journal entries denoting the costs and profits from H&K (Heckler&Koch) weapons for the period November 2019 to June 2020. A review of many of the firearms that agents in Phoenix came across while investigating FIORENTINO showed SULLIVAN had imported them into the country before sending them to FIORENTINO.

23.     During a custodial, post-Miranda interview with FIORENTINO, he estimated his total payments to SULLIVAN for firearms and accessories during the time they had been in business together to be somewhere in the $200,000 to $400,000 range. Investigators know from their WhatsApp conversations that they would regularly surcharge their customers for firearms imported under restricted licenses but unlawfully diverted to private collections.

24.     After FIORENTINO's arrest, agents applied for and received a federal search warrant for FIORENTINO'S cell phone[2]. A computer forensics analysis of that phone resulted in the recovery of conversations between FIORENTINO and VICKERS using the normal Apple iMessage services. A review of those conversations as captured from FIORENTINO'S phone showed that FIORENTINO and VICKERS were in contact with each other via voice calls, emails, and text messaging.  Those conversations always revolved around the topic of firearms, usually

---

[1] US v. FIORENTINO, Search Warrant # SW2020-8301MB, signed by United States Magistrate Judge John Z. Boyle of the District of Arizona.
[2] US v. FIORENTINO, Search Warrant # SW2020-8301MB, signed by United States Magistrate Judge John Z. Boyle of the District of Arizona.

with FIORENTINO asking VICKERS if he or anyone he knew wanted to buy a particular weapon. On April 27, 2020, FIORENTINO sent VICKERS a text with the following exchange:

> CF: Know anybody looking for a Semi Auto SA80? Real deal moon rock.
>
> LV: Maybe, how much?
>
> CF: 45k.
>
> LV: Ok, I'll pass the word.
>
> CF: I've never seen a semi, have you?
>
> LV: Only in pictures. Only a couple in the USA.[3]

25.     Less than two hours after that conversation started, FIORENTINO texted VICKERS back and said "That thing sold fast. Sorry bro. Keep me in the loop on anything HK related. Stay Safe. Chris." FIORENTINO then texted VICKERS three hours later and said "Thx pal. I'm looking for a MR308," to which VICKERS replied "Ok."

26.     Two days later on April 29, 2020, FIORENTINO texted VICKERS and said "Keep it on the QT but Sean [SULLIVAN] and I are working on bringing in a nice order of PSG-1's. Out of respect, you can have one at our cost. They are the early version that have the "D" serial prefix." VICKERS replied with "Awesome! Price?" FIORENTINO said "Between us. If we buy them all. Around €8500. (Plus shipping/FET/etc). And as soon as this corona shit is over, I'm gonna fly over and check em out in person. They are excellent condition besides the coffin cases have some storage wear." I know from my training and experience that the HK PSG-1 rifle is importable only

---

[3] While investigators would need the firearm in their custody to determine with certainty that it is illegal to own privately, a generic model SA80 rifle would likely be illegal to possess outside of a Law Enforcement/Military exemption because they were generally only manufactured as a select fire weapon (meaning they fired both semi-automatic and fully automatic and, as such, would fall under the classification of a machine gun. Although again, an official examination would need to be conducted to affirmatively say the weapon is regulated, but given the cost of the item noted in their exchange ($45,000) investigators believe it is more likely than not that it is a prohibited firearm subject to import restrictions.

when requested by a law enforcement or military agency for official use but, even then, the base cost as noted by FIORENTINO would make the firearm ill-suited for law enforcement usage, as no agency would pay almost $10,000 for one firearm.

27.     In an email from FIORENTINO to VICKERS dated May 26, 2020, FIORENTINO wrote the following to VICKERS: "Hey brother, looking to sell a rare Belgium FAL. Type 2 receiver. Competition model. G series serial but not a G series. No import. This is a 1967 production. Includes original Hensoldt optic. $10k is my bottom line. This might be the rarest FAL in the country. Let me know. Includes some mags. As you would say – it's moon rock status." VICKERS responded the next day with the following email: "Cool gun but… Definitely not the rarest FAL in the USA. I've got several that are far more rare – your best bet is Gunbroker for that start at a penny auction. Honestly that is a rare FAL but not quite as rare as you think. I would be surprised if you got $10k for it. You might want to keep it." Through my training and experience, I know that based on the photo FIORENTINO attached with the email to VICKERS, the firearm is likely a machine gun that was not legally imported into the United States since he said there was "no import," implying there were no import markings. VICKERS' response that he had rarer firearms in his possession led investigators to believe that he had weapons of a similar nature (illegally imported) in his possession, a fact which was confirmed once the search warrant at VICKERS' residence was executed (and which is further described below).

28.     Also found in FIORENTINO'S phone was a conversation between FIORENTINO and SULLIVAN over the WhatsApp messaging service, which I know from my training and experience to be an end-to-end encrypted messaging service. This means that without physical access to the handset used by one of the two parties, investigators would not be privy to any of the conversations. In this instance, agents in Phoenix had FIORENTINO'S phone and, following the

execution of the aforementioned search warrant, they uncovered the WhatsApp conversation in question which ran from late 2019 to October 2020 when FIORENTINO was arrested. Agents in Baltimore gained access to that WhatsApp conversation in January 2021. An analysis of those messages revealed that SULLIVAN had extensive dealings with an importer in Austria, as well as others across Europe. In January 2021, investigators also became aware that the previous owner of B&T USA (the American arm of B&T Switzerland, a well-known firearms manufacturer), had relinquished his sole ownership of the company to SULLIVAN, and notified ATF that SULLIVAN would be the sole owner of B&T USA. That change became effective December 15, 2020.

29.     SULLIVAN and FIORENTINO's business arrangement, as captured on the WhatsApp messages, led investigators to conclude that they would import firearms (via TRIDENT'S import license) they knew had value to other firearms collectors. Investigators also confirmed that SULLIVAN was aware that FIORENTINO did not possess a Federal Firearms License, because, in one WhatsApp message with SULLIVAN from December 19, 2020, FIORENTINO told SULLIVAN regarding the shipment of a firearm "No worries. Nice work. Here is my FFL that I'm using until I get my license." Investigators believe that SULLIVAN and FIORENTINO catered to a certain set of collectors who had a proclivity for high-end firearms which are frequently difficult to obtain in the United States. These firearms include those manufactured by Heckler & Koch (H&K) in Germany, as well as other expensive and hard to obtain weapons.  They also imported accessories and lesser firearms but made a significant portion of their proceeds on H&K firearms.  Your affiant knows, based on training and experience with firearms, that H&K firearms are highly desired among owners of significant weapons collections.

30.     The large number of H&K firearms imported by Trident LLC drew the attention of investigators, because some of the firearms required a law enforcement or military exemption letter in order to be imported.  I know that a licensed importer can import a firearm that would otherwise be impermissible for import into the United States under certain conditions: The importer must have a written request from the entity wishing to test or purchase the firearm; the firearm is only for demonstration or sale to a law enforcement entity once it enters the United States; and the firearm cannot be sold or transferred to personal buyers or other FFL's who do not have a similar law enforcement exemption letter for that exact make and model of firearm.

31.     When looking for import exemption letters that SULLIVAN used in the past, investigators located many from various police departments around the United States, with one particular law enforcement exemption letter from the Ray Police Department in Ray, North Dakota being noteworthy. That specific request was dated June 20, 2018, and was sent to VICKERS TACTICAL, from the Ray Police Department. The letter requested that VICKERS TACTICAL import six different models of H&K firearms, two of each model, for demonstration to the Ray PD for possible purchase. VICKERS TACTICAL subsequently sent SULLIVAN and Trident Rifles LLC a purchase order dated June 27, 2018, requesting that SULLIVAN acquire the weapons on its behalf, under the law enforcement/military use or demonstration exemption.

32.     SULLIVAN filed an ATF Form 6 on June 29, 2018, in which he requested permission to import the same twelve firearms.  That request was granted on July 11, 2018 (permit #2018-04010). It should be noted that all the firearms SULLIVAN requested to import were Short Barrel Rifles that would not be permissible for import into the United States without the law enforcement exemption, as set forth in the letter from the Ray PD. SULLIVAN then filed an ATF

Form 6a on March 25, 2019, in which he declared that he imported eight H&K firearms consisting of six MR223 rifles and two MR308 rifles.

33.     Investigators believed the request by the Ray PD, VICKERS TACTICAL, and SULLIVAN to import twelve firearms to be suspicious. The Ray Police Department consists of only one sworn officer. Your affiant found it unusual that a one-person police department would need a demonstration of twelve distinct firearms for possible purchase (let alone two of each make and model). In contrast, investigators determined from ATF records that SULLIVAN has, in the past, provided demonstration weapons for the Miami-Dade Police Department, but only sent them single samples of three different firearms. I know from my training and experience that a transfer of an NFA weapon requiring an import exemption (such as a law enforcement exemption) is documented with the ATF via an ATF Form 5. Investigators have been unable to find any documented transfers of the firearms being imported for demonstration for the Ray PD at any point, either by VICKERS TACTICAL or SULLIVAN. For further emphasis, agents located ATF Form 5's from SULLIVAN to the Miami-Dade PD in which SULLIVAN notified ATF that he was transferring three NFA regulated firearms to the Miami-Dade PD for demonstration. After a period of time, during which the Miami-Dade PD presumably tested the firearms to determine if they would suit their operational needs, the Miami-Dade PD sent the firearms back to SULLIVAN and the ATF was again notified via a completed ATF Form 5 that the transfer back to SULLIVAN had taken place. This type of occurrence is not unusual and, if documented properly, would be permissible. However, investigators have not been able to locate any ATF Form 5's to indicate the transfer of NFA regulated firearms from either VICKERS TACTICAL or Trident LLC to or from the Ray PD.

34.    Additionally, investigators have looked into the transactions wherein ███ has also used demonstration request letters from police departments to import otherwise impermissible weapons.  It was determined that over the last 6 years, ███ and ████████ regularly used demonstration letters to import otherwise impermissible firearms for the Sweeny, Texas Police Department and the Sweeney Independent School District (of Texas) Police Department. The Sweeny, Texas Police Department consists of 8 sworn officers while the Sweeny Independent School District Police Department consisted of a single officer (who quit in 2019 pending an investigation) during the time period when ███ acquired and utilized demonstration letters from those departments.  These demonstration letters are further described below.

35.    As a result of the search warrant at VICKERS' residence and the information gained from same, and as further described below, your affiant believes that ███ has conspired with VICKERS and/or SULLIVAN and/or FIORENTINO and/or the Chiefs of Police of various police departments to divert regulated firearms imported under the law enforcement/military demonstration or use exemption to private collectors.

## THE H&K MR308 RIFLE

36.    While researching the import request related to the Law Enforcement exemption described above for the Ray PD and VICKERS TACTICAL, agents noticed that on or about July 19, 2020, SULLIVAN (on behalf of Trident LLC) filed an ATF Form 6a against the previously filed and approved Form 6 Trident Rifles LLC had filed in 2018 (permit #2018-04010). On said ATF Form 6a, SULLIVAN declared that he had imported one H&K G28 rifle, bearing serial number 144-006259 from B&T AG (located in Switzerland), and represented that the firearm was not a short barrel rifle but was instead a standard rifle.

37.     Agents also became aware of a WhatsApp conversation between FIORENTINO and SULLIVAN dated July 15, 2020:

> **FIORENTINO:** "Can you get another MR308? I have some interest from a client-we can both split the profits and probably make some decent coin".
>
> **SULLIVAN:** "Let me see what I can dig up".

38.     A second message from FIORENTINO to SULLIVAN on July 19, 2020 read as follows:

> **FIORENTINO:** "Send me the invoice for:
>
> 14x Sig PE90
>
> 1x Sig 550-sniper
>
> **1x MR308**  (Emphasis supplied)
>
> 1x SFP9L OR
>
> 2x MR223 Barrel Group (credit 1)
>
> 1x P7 PSP (if you want to sell)
>
> 1x HK MP5 RAL8000 Trigger
>
> MP5 Posters (No Charge)
>
> 2x B&T SP5K Stocks (No Charge)
>
> Questions: do you have any of the MR223 magazine around or any of the other HK parts imported".

39.     Investigators then recovered an invoice from the WhatsApp conversation, dated July 19, 2020. The invoice was from Trident LLC, billed to Chris FIORENTINO, and showed shipment to ███████████ (███████████ is a FFL located in Phoenix, Arizona, that

FIORENTINO frequently used). One of the items on the invoice is noted as "HK G28/MR308 S/N 144-006259" with an associated price of $6,675.00.

40.     ATF investigators in Phoenix took photographs of ▮▮▮▮▮▮ Acquisition and Disposition Book (A&D), a required book for all FFLs to document firearms received and disposed of by them during the course of regular business. The photographs of ▮▮▮▮▮ A&D book show an entry made on July 29, 2020 in which ▮▮▮▮▮▮ received and recorded a H&K MR308 rifle bearing serial number 114-006259 from Trident LLC, which ▮▮▮▮▮ subsequently released to Chris FIORENTINO. Investigators also received a copy of the Report of Multiple Sales of Other Dispositions of Certain Rifles, which shows on August 4, 2020, ▮▮▮ ▮▮▮ gave possession of the MR308 to Christopher FIORENTINO. In another WhatsApp conversation, FIORENTINO messaged SULLIVAN: "Nice Packaging, Everything arrived perfectly. Thx", on July 29, 2020.

41.     Agents believe that the firearm listed in ▮▮▮▮▮▮ A&D book as 114-006259, is actually the firearm discussed between FIORENTINO and SULLIVAN bearing serial number 144-006259. A H&K USA representative contacted by investigators advised that H&K does not have any records of a firearm bearing serial number 114-006259, and, stated that the "114" prefix was used by H&K to denote a pistol, not a rifle. Furthermore, the H&K representative said that the "144" prefix was used by H&K to denote an MR308 rifle and that, after checking their company records for serial number 144-006259, he confirmed for agents that it belonged to a H&K MR308 rifle manufactured in Germany. These facts from H&K led investigators to believe the serial number was entered incorrectly in the A&D book by the FFL. Furthermore, as noted above, the "114" prefix on the firearm corresponds to a handgun of a totally different model and

caliber, rather than a .308 caliber rifle, further leading investigators to the conclusion that ████ ████ entered the incorrect serial number when documenting the transfer.

42.     According to an ATF Firearms Enforcement Officer, who is an expert in the area of firearms classifications and analysis, the H&K MR308 is the semiautomatic version of the H&K 417 machinegun. The HK MR308, as configured by H&K when they export the firearms from Germany (in a rifle configuration as opposed to a pistol), would not meet the required criteria to be imported into the United States, unless there was an applicable law enforcement or military exemption. Consequently, it is illegal to import the HK MR308 into the United States, barring an exemption for law enforcement or military use, or research and testing purposes.

43.     At the time SULLIVAN and FIORENTINO were having the above conversations about importing a HK MR308 rifle, permit #2018-04010 no longer had an allowance for a HK MR308 rifle to be imported; SULLIVAN had already imported the two allowed for VICKERS TACTICAL to demonstrate for the Ray PD, and this import will be discussed further below. However, the permit still had an allowance for one H&K G28 rifle to be imported for the law enforcement demo on behalf of VICKERS TACTICAL before the permit was set to expire. Investigators believe SULLIVAN used the guise of importing the remaining H&K G28 rifle as a cover for importing a HK MR308 rifle noted above. According to H&Ks website, the G28 rifle is the military version of the MR308 rifle and, therefore, looks similar in design and may appear to be the same firearm if inspected by a layperson.

44.     According to correspondence with a HK USA representative, serial number 144-006259 is a serial number assigned to a HK MR308 rifle, and not a HK G28 rifle. The HK MR308 rifle is manufactured by HK in Germany and is designed as a semi-automatic rifle which fires a .308 caliber (7.62mm) round. According to United States import regulations, it is illegal to import

a HK MR308 rifle without an exemption, such as that given for law enforcement or military demonstration and/or use. Unlike the firearms requested for importation in the July 11, 2018, ATF Form 6 under the law enforcement demonstration exemption, SULLIVAN received no such exemption to import the HK MR308 bearing serial number 144-006259.

45.     In addition, your affiant believes that the diversion of firearms imported under an exemption to a private purchaser is a regular practice employed by ███ VICKERS, FIORENTINO, and SULLIVAN.   In the July 15, 2020, WhatsApp conversation between FIORENTINO and SULLIVAN, FIORENTINO wrote "Can you get another MR308?"  Your affiant believes this message indicates an ongoing business relationship between them, wherein SULLIVAN diverted other specialty weapons imported under cover of exemptions to private purchasers, contrary to federal law. VICKERS, by virtue of providing the law enforcement request letter from the Ray PD, assisted SULLIVAN and FIORENTINO in this particular venture and ███ via his conversation with investigators on September 15, 2021, indicated he had a hand in the transfer, in which the sellers netted over $20,000 in profit from the sale of the MR308 rifle to a private customer. The import and sale of the MR308 would not have been possible had VICKERS not provided SULLIVAN the cover of a law enforcement letter and the import allowances it provided.

46.     After locating the purchaser of the HK MR308 rifle in question, investigators contacted him on September 13, 2021, and advised that he was in possession of an illegally imported weapon. While upset, the buyer indicated he understood and agreed to and did relinquish the firearm to ATF agents in Atlanta (the ATF office nearest his home). Further, the buyer told investigators that he bought the firearm from FIORENTINO and had no idea it was illegally imported, although he did concur with investigators when they identified the weapon as a HK

MR308 (rather than a HK G28). Once taken into ATF custody, agents confirmed that the firearm was, in fact, a HK MR308 rifle bearing serial number 144-006259, which is the same rifle imported illegally by SULLIVAN as discussed above.

## VICKERS AND LAW LETTER REQUESTS

47.     Based on the information stated above and VICKERS' involvement with FIORENTINO and SULLIVAN, investigators began looking into VICKERS and his history with the importation of firearms for demonstration and sale to police departments. It quickly became apparent that VICKERS has, over the last ten years, utilized the law enforcement exemption letter with great frequency, with the vast majority of his requests coming from the Ray PD and the police department of Coats, North Carolina. Specifically, since 2012, VICKERS has submitted approximately thirty-two (32) law enforcement request letters from the Ray PD for an approximate total of seventy-two (72) firearms requested while for the Coats PD, he has submitted approximately fifty-three (53) letters requesting an approximate total of ninety-two (92) firearms. The Coats, NC police department has seven sworn officers, which means that between the sole officer at the Ray PD and the seven from Coats PD, those departments provided Larry VICKERS with a total of eighty-five (85) law enforcement request letters seeking the importation or transfer of one hundred and sixty-four (164) firearms. It is worth noting the similarities between these police departments and those that ▮▮▮▮ used in Sweeny, Texas, insofar as all of them are small departments with few officers and relatively miniscule budgets.

48.     Of those firearms requested, which are all supposed to be for law enforcement demonstration/usage, there are a large number that are simply unsuitable for law enforcement. For instance, some of the firearms requested by the Ray PD are belt-fed machine guns that are more commonly used in warfare than on the streets of a small American town. Many utilize 7.62cal

ammunition, which is both expensive and hard to come by, as well as being a non-standard police issue caliber. Other weapons are no longer in production, as they were made by the Germans, Russians, or Chinese in the years preceding and just after World War II. Others are Soviet-era firearms made by companies which no longer exist. Many of these weapons, however, have significant value from a collector standpoint because of the difficulty of purchasing them in the American market. Ostensibly, none of the weapons should be for sale in America because they should all be in the hands of Licensees for use by law enforcement entities or for testing and evaluation purposes. As evidenced above with the MR308, the weapons can be, and are, diverted to private collectors and other purchasers for financial gain.

## SEARCH WARRANT EXECUTION AT THE VICKERS RESIDENCE

49.     On August 25, 2021, agents executed the previously discussed and authorized federal search warrant at the home of Larry VICKERS and his wife, ███████████. Both Larry and ████ VICKERS agreed to speak with investigators while the search was served, and both gave written consent for the forensic downloads of their cell phones and electronic devices by an ATF digital forensic specialist. Before the search of the residence was fully underway, agents noticed that ██████ VICKERS was texting someone, at which point they asked her who she was conversing with. She showed agents her phone and said she had been texting "███████." Sure enough, the first person ██████ texted that morning as ATF was clearing the house was ██████ when she texted him to alert him that ATF was at their residence. Agents then cautioned both of the VICKERS' to refrain from advising anyone of the fact a warrant was being served at their house, lest people start asking questions as to why, placing the VICKERS' in an awkward situation. ██████ VICKERS then responded to ██████ text of "Why?" with an idea suggested by agents, which was that the ATF was there simply to confirm their recent change of address

23

application. When asked why she would text ██████ first about the warrant, ██████ told agents that ██████ was a close family friend who had been working with Larry to sell some of his guns online. Wendy said those sales were generating substantial revenue but did not clarify how much.

50.     When Larry VICKERS was asked about ██████ he said they had been friends for years and that he (██████ was helping Larry sell some of his guns online. When asked what guns he was selling, VICKERS demurred and changed the subject. When agents asked VICKERS what his previous relationship with ██████ was, he again demurred and changed the subject.

51.     A search of the VICKERS residence resulted in the recovery of over 225 firearms and firearms-related parts and pieces (such as receivers, etc.), the majority of which appeared to agents to be machine guns or short barreled rifles, which would both fit under the definition of the National Firearms Act. However, many of these firearms were not registered to VICKERS in the NFRTR, nor did many of them appear to be stamped with the proper import markings or serial numbers. Additionally, VICKERS' acquisition and disposition books that agents recovered did not have many of the items listed either, which is in direct contravention to the record keeping requirements all FFL's must follow. Agents did note during the identification and seizure of the firearms that many appeared to be the same firearms they had seen requested on law enforcement demonstration letters for the Coats, NC and Ray, ND police departments, which leads investigators to believe that their previous suspicions around VICKERS' use of demo letters was correct, insofar as they were fraudulent from their inception and VICKERS was using them to introduce prohibited firearms into the United States that he intended to keep for himself or sell to other collectors.  All told, investigators estimate the value of the firearms taken from VICKERS to be in excess of $1,000,000.

## INTERVIEW OF JAMES SAWYER

52.    Ono the same date agents executed the warrant at VICKERS' residence, August 25, 2021, investigators in North Dakota travelled to Ray, ND to speak with the Police Chief, James SAWYER. When questioned about his relationship with VICKERS, he stated that he considered VICKERS to be a good friend. When asked about all the demonstration letters he wrote requesting firearms for the Ray PD, he confirmed he wrote those but that they were all at VICKERS' request. He then stated that not a single firearm he'd requested was ever demonstrated to him and he had never seen any of them in an official capacity. He then noted that there was no money in the town budget to purchase any of the firearms before confirming that he never had any intention to purchase a single one of the guns he'd requested on the demo letters he provided to VICKERS. He stated he provided the letters to VICKERS because he trusted him and considered him a close friend.

## ANALYSIS OF LARRY VICKERS' CELL PHONE AND I-PAD

53.    As noted above, Larry VICKERS gave written consent to have his cell phone and iPad forensically downloaded, copies of which were provided to case agents in the days following the execution of the search warrant. Upon analysis of his phone and iPad, agents immediately realized there was a wealth of information stored in the pictures and messages VICKERS had in the phone and iPad; more specifically, there were tens of thousands of instant messages and WhatsApp messages with numerous people, spanning at least the last seven years. Analysis of the messages between VICKERS and the Chiefs of Police at Coats, NC and Ray, ND confirmed what agents believed, insomuch as it was clear that VICKERS was using them to provide fraudulent law letters so he could import restricted firearms. Further, the conversations between VICKERS and the police chiefs showed that they were all knowing participants in the scheme and that none

of the firearms ever made it to their alleged destinations in Ray, ND or Coats, NC. An interview of the Ray, ND Chief of Police James SAWYER confirmed as much, when the Chief told agents that he had never seen a single one of the firearms for which he had created demonstration/use request letters.

54. Additionally, the extensive conversations between VICKERS and SULLIVAN confirmed that the two had engaged in conduct whereby they would import all sorts of otherwise-prohibited firearms under cover of law enforcement demonstration letters for the purpose of bolstering their personal collections, making popular YouTube videos (in the case of VICKERS), or for resale to other persons across the country for financial gain (in the case of the HK MR308, for example, as mentioned above). All told, VICKERS had tens of thousands of texts between himself and co-conspirators, both known and unknown, many of which referenced the scheme to fraudulently import restricted firearms in violation of federal firearms laws and to profit financially from the import and resale of otherwise-impermissible regulated firearms.

## CONVERSATIONS BETWEEN VICKERS AND ██████

55. The electronic conversations between ██████ and VICKERS are extensive. The pair had over 15,000 messages spanning from 2014 through the day before agents executed the warrant at VICKERS' home on August 25, 2021. It was clear from an analysis of these texts that while Larry VICKERS was mostly untruthful with agents during his interview at his house on the day of the search warrant, he was candid when he said he had known ██████ for years and was in business with him.

56. More specifically, the texts between the two, show that they corresponded with great frequency since at least 2014, mostly about firearms and business but occasionally about personal matters. With regard to their texts about firearms, the two regularly spoke about how

valuable and/or rare certain firearms on the market were, how much money they would generate if up for sale, and how to acquire the firearms in the first place. Both ▮▮▮ and VICKERS frequently utilized the same method to acquire precious and/or rare firearms from abroad: the law enforcement demonstration letter. As noted in the exchange between the two from July 2015, it appears to investigators ▮▮▮ and VICKERS both had Chiefs of Police at their disposal to generate illegitimate demonstration letters for the purpose of illegally importing firearms

57.     Beginning on July 2, 2015, VICKERS and ▮▮▮ had the following conversation, which investigators believe is VICKERS making reference to the Chiefs of Police in Ray, ND and Coats, NC, while ▮▮▮ is believed to be making reference to the Chief of Police of Sweeny, PD:

> VICKERS: Waiting on one more letter.
>
> ▮▮▮ No worries, will you have it before Monday?
>
> VICKERS: I hope.
>
> ▮▮▮ Hahaha, did you hedge your bets with demo letters?
>
> VICKERS: ?
>
> ▮▮▮ You gave me the idea you got two different letters from two different PDs.
>
> VICKERS: No, Same PD but it's a new guy so gotta take him threw the process slow.
>
> ▮▮▮ Damn, You must be screaming internally at this point.
>
> VICKERS: Yes, I had to give my primary guy some breathing room cause he has done so many for me.
>
> ▮▮▮ Luckily, my chief is a gun nut.

58.     Beginning in early May of 2018, ▮▮▮ and VICKERS began discussing the sale of some of VICKERS' imported machine guns that ▮▮▮ would facilitate. That conversation

started in earnest on May 8, 2018, with ▮▮▮▮ telling VICKERS "I'm going to get a letter for your IAR, let me know what others you'd like to sell." I know from my training and experience that "IAR" is likely a reference to a Colt Infantry Automatic Rifle, which is a machinegun designed for use by soldiers in a combat environment, not civilians or law enforcement. On May 18, 2018, ▮▮▮▮ and VICKERS had the following exchange:

> "▮▮▮▮ Send me a list asap of which post samples you want me to take on a letter and flip no-letter, I can get that done this and next week.
>
> VICKERS: Ok, will do.
>
> ▮▮▮▮ Just wait till I get my hands on this imported stuff (devil emoji face).
>
> VICKERS: Hey here's a few right off the top of my head to let go: F2000 trigger pack, M2 carbine trigger pack, RPK – Vickers Tactical made, UZI – Vickers Tactical Made, look those up on my list and double check them with me, those are in addition to the ones you have listed now to sell, there will be more.
>
> ▮▮▮▮ Want me to get letter and take them in? Also when do you want the galil[4] to ship if not today?
>
> VICKERS: Yes – go ahead and take the guns into your inventory, ship it to arrive Wednesday – Thursday next week, so ship Monday.
>
> ▮▮▮▮ I can take just about everything except the uzi since I already have 2 in my inventory. I'll get a letter together for the posties I'm taking from you.
>
> VICKERS: Hey add M16A4 – Vickers Tactical to that list.
>
> ▮▮▮▮ OK, let me know what you have in them, depending on that it may or may not be worth selling but we will figure it out."

---

[4] The Galil is an Israeli-made weapon.

59.    On May 24, 2018, the pair had the following exchange via text message, which was a continuation of the previous conversation:

> "████    I'll get a list together and confer with you beforehand, I'll get a letter for all and transfer to myself. Let me know what you've got in them or what you want to get out of them so we can figure it. IAR and Colt CK901 would be big sellers.
>
> VICKERS: Vickers Tactical AK74[5], the one in the video I did (inside the AK74) sell it. Colt AR open bolt lower complete, this should bring good $$$. FG42 receiver, missing rear portion, perfect for a kit build/restoration. Colt M4 Malaysian contract, brand new with cardboard wick in bbl. I might have already sent you this? Vickers Tactical M16A4, used in my HK416 video as a comparison. RPK, Vickers Tactical built, great shooter RPK. Vickers Tactical UZI built, same on as in my video.
>
> ████    Okay, that's 12 guns, can't take the uzi since I've already got 2 in inventory. Craig Gottlieb's 4 post samples brought $14k, just fyi. If that gives you an idea of what these will bring. Keep sending guns you wanna move as they come to mind.
>
> VICKERS: Add the Vickers Tactical MP40 to the list."

60.    I know from my training and experience that the conversation above is in relation to VICKERS and ████ planning a strategy for the sale of a number of NFA firearms that VICKERS had in his possession. I also know that the vast majority of the firearms discussed are wholly unsuitable for use by law enforcement. To wit, the items described as 'trigger packs' aren't completed firearms, but rather components that must be registered with ATF as NFA items because they can be readily built into machineguns; same goes for those described as "lower" and

---

[5] The AK74 is a smaller version of the AK47.

"receiver." However, no police department would ever buy machine guns they had to build themselves, rather they would buy completed firearms built by reputable manufacturers for both safety and cost reasons. Further, the items labeled as "Vickers Tactical" builds are indicative of the fact that VICKERS himself built the weapons from parts kits, thus making them unsuitable for law enforcement transfer and/or use because they would not meet the criteria requiring that machine guns transferred under law enforcement exemptions be in current production so a large order could be fulfilled should a law enforcement agency actually wish to purchase particular makes or models of firearms.

61.     I also know that in the above conversation, ████ repeated references to getting letters to transfer the firearms to himself are a reference to acquiring law enforcement demonstration letters so he would lawfully be permitted to transfer the firearms from VICKERS to ████ VICKERS and ████ your affiant believes, planned to sell most, if not all, of the firearms at issue. Based on the references both ████ and VICKERS made above to their chiefs of police they had on hand to write demo letters, I believe in this instance that ████ was making reference to the fact he was going to go to his police chief contacts in order to obtain a fraudulent letter (or letters) in order to cause the ATF to permit the transfer of the restricted use weapons from VICKERS to ████

62.     In the ensuing days after these conversations, completed ATF electronic forms transferring the firearms were submitted by VICKERS for transfer to ████ although agents believe ████ may have generated the paperwork on behalf of VICKERS. Accompanying the forms was a signed demonstration request letter from the Sweeny Independent School District (SISD) Chief of Police ████, dated June 1, 2018. It is worth noting that the SISD police department consisted of only one officer, Chief ████, and yet Chief ████ noted in his demo letter

to ▮▮ that the SISD police department had ten sworn officers when, in fact, there were a handful of unpaid, part-time officers and Chief ▮▮. More concerning is that Chief ▮▮ letter requested the demonstration of two of each of the thirteen firearms, which is a tactic used by VICKERS and others, and recognized by investigators, to allow ▮▮ to transfer additional restricted firearms to himself should additional restricted firearms become available in the future. Once ▮▮ had the letter, the forms were submitted to ATF on June 1, 2018 and approved on June 5, 2018, less than a month after they first started texting each other about the transfer of the restricted firearms. The transfer of restricted firearms between two FFL's who possess a Special Occupational Tax stamp (which is the tax paid to ATF yearly that permits registered FFL's to buy, hold, and sell restricted firearms) is permitted on the condition that the receiving FFL has a demonstration letter for law enforcement or military use and, further, that the letter requests the exact same make and model of firearm being transferred.

63. During another conversation between VICKERS and ▮▮ on July 18, 2018, ▮▮ texted VICKERS and said "Hey man, I got a deal on an original PPSH but I can't take it, can you get a letter and take it and I'll pay for it all? It's in better condition than mine. VICKERS replied with "Yes, send me the details and I'll get a letter fired up. Should I do that special "I need 2 verbiage" in the letter since I already have one ppsh41?" ▮▮ asked VICKERS "You want me to do you up the letter template on the PPSH?" to which VICKERS responded in the affirmative. ▮▮ then asked how soon he could have a signed copy back and VICKERS said "Very soon, with my guy maybe tomorrow."

64. I know based on my training and experience that the PPSH is a machinegun subject to registry in the NFRTR and, perhaps more important, it is a weapon no longer in production (at least not the model that ▮▮ and VICKERS are speaking of) and thus not suitable for law

enforcement demonstration/usage because it could not be acquired by law enforcement from the manufacturer should the agency wish to make a purchase. I also know that ▮▮▮▮ stating he "can't take it" meant that he already had one or more in his inventory and he needed VICKERS to acquire it because he had room in his NFRTR inventory to hold a second PPSH.[6] Your affiant believes , because ▮▮▮▮ was asking VICKERS to acquire the weapon for him via demonstration letter and because he would pay for it, means it was never destined for any police department and the entire transaction was fraudulent and in violation of a number of federal statutes.

65.     In a series of texts between SULLIVAN and VICKERS on August 20, 2019, the two discussed an $11,500 check going to SULLIVAN from VICKERS. The next text after that was VICKERS telling SULLIVAN "Also 11.7 k will be coming to you from Jonathan ▮▮▮▮ for guns he is selling for me," which SULLIVAN acknowledged. Six days later, SULLIVAN texted VICKERS a picture of two machine guns with a follow up text stating "$3550… 8 available. Offered to you and Jonathan ▮▮▮▮ Feel free to pass along. From my Swiss source." VICKERS replied a few hours later with "Very cool! I'll take one. I'll think on who else might want one. Thanks! Ping me with the info for the demo letter and I'll get on it." As evidenced by these series of texts, ▮▮▮▮ VICKERS, and SULLIVAN were all working together to utilize fraudulent demonstration letters for their own financial gain.

66.     On March 12, 2021, VICKERS texted ▮▮▮▮ the following: "Hey when you come up please bring a spread sheet showing all the guns and serial numbers you have sold for me since the big machine gun sale," to which ▮▮▮▮ said "Ok, I can just email that to you." He followed it up shortly thereafter by advising VICKERS he just emailed him said spreadsheet. The implications

[6] FFL's are permitted only two of the same make and model in their NFRTR inventories if the firearms are subject to law enforcement only restrictions, which would apply to the PPSH due to the fact it was being brough in on a demonstration letter.

in this text are twofold: first, that ▮▮▮ and VICKERS work together to sell firearms for their personal profit and secondly, that they had recently completed a "big" sale of machineguns together. Given that agents are now certain VICKERS obtained the vast majority of his machineguns illegally via fraudulent demonstration letters, those sales would all be illegal as well, a fact which your affiant believes ▮▮▮ was aware of but disregarded for financial gain.

67.    At the end of March 2021, ▮▮▮ flew to Charlotte, NC to meet with VICKERS for the purpose of driving a rental truck back to Houston that was to be loaded up with guns, magazines, and ammunition from VICKERS' residence. That trip appears to have occurred on March 26, 2021, and ▮▮▮ headed back to Houston shortly thereafter. In a text on March 29, 2021, ▮▮▮ texted VICKERS "65 rifles total." On March 30, 2021, he texted VICKERS "I got all the guns unloaded, ammo unloaded, returning the truck today, and I'm going to start pics / listings this week." Your affiant believes that ▮▮▮ is often utilized by VICKERS to liquidate firearms from VICKERS' inventory, a fact confirmed by both Larry and Wendy VICKERS during the search warrant at their house, and you affiant further believes that many of these firearms are restricted and/or were illegally imported into the United States through the use of fraudulent demonstration letters.


**PHONE CALLS WITH JONATHAN ▮▮▮ IN SEPTEMBER 2021**

68.    As a result of the investigation into ▮▮▮ and other FFL's, investigators took steps to freeze the NFA inventories of ▮▮▮ and other FFL's so that they would not be permitted to transfer any more firearms imported and/or acquired under false pretenses until agents were prepared to address each FFL and conduct a thorough inventory of the firearms. As a result of those inventory freezes, ▮▮▮ reached out to investigators to discuss the reasons why his and

other inventories were frozen. Agents were cautious about calling ███ back because they were aware he was previously a Houston (Texas) Police Officer and a Sweeny (Texas) Police Officer and was likely calling to see what investigators would divulge about the ongoing investigation.

69.    Investigators spoke with ███ at length on both September 15 and September 16, 2021. During the conversations ███ stated to agents that his business model was to help other FFL's sell their NFA firearm inventories, especially when they go out of business. It is worth noting that the "out of business" filing provides a sort of loophole for FFL's to liquidate their NFA inventories without the restriction of needing law enforcement demonstration letters to sell items to other Special Occupational Tax (SOT) holders. Essentially what this means is that an FFL can build up their NFA inventory with firearms that are rare, expensive, collectible, etc., sometimes through the use of law enforcement demonstration request letters or testing and evaluation letters, then notify the ATF that they plan to go out of business on their current license. That filing allows them to liquidate their inventories to anyone who holds a valid SOT stamp, to include normal citizens who possess same[7], which enables non-FFL's to acquire restricted firearms and further sell or dispose of the weapons for financial gain.

70.    During the call, ███ told agents that he believed he was the only person specializing in this area and he brokered deals worth significant amounts of money. He went on to note that he always acted as the intermediary who would collect the money and hold it in his account pending the paperwork processing and receipt of firearm(s) by the buyer, at which time the funds would be released to the seller, minus his fee for brokering the deal. He went on to state that he was in the process of helping ███ Weapons go out of business and had recently sold

_____

[7] In theory a regular citizen who possesses a SOT stamp should not be permitted to acquire a restricted machinegun but, given the fact that the constant shuffling of these weapons through the system can create confusion about their appropriate classification, agents are operating of the belief that this shuffle coupled with human error may permit this to occur.

a lot of 16 NFA weapons at auction, a transaction that was now held up because of the freeze on his (and the other FFL's) inventories. ▮▮▮ said he had six-figures held up in the deal and was wondering how fast agents could unfreeze the transactions. When investigators told ▮▮▮ it was because of SULLIVAN'S actions that their inventories were frozen, ▮▮▮ became flustered.   In a follow up call the next day, ▮▮▮ noted for agents that of the 16-weapon deal he had recently brokered, only two of the guns were from SULLIVAN. He then asked if there was any way to unfreeze the rest of the guns in that transaction so it could go through, which the agents advised would not be possible. ▮▮▮ also stated to agents that he kept spreadsheets for everything, which leads investigators to believe he uses computers and/or tablets to keep track of his business affairs.

**EXECUTION OF SEARCH WARRANT AT THE ▮▮▮ RESIDENCE**

71.     On September 28, 2021, agents executed the previously discussed and authorized federal search warrant at the home of Jonathan ▮▮▮ agreed to speak with investigators while the search was conducted and gave written consent for the forensic downloads of his cell phone and computer by an ATF digital forensic specialist. ▮▮▮ did request to call his attorney, who then arrived at the residence and was present while ▮▮▮ spoke with investigators.  Prior to the lawyer arriving, ▮▮▮ did preliminarily speak to investigators on his own accord. ▮▮▮ stated he had previously sold and was currently selling firearms for VICKERS. ▮▮▮ mentioned traveling to VICKERS' residence on multiple occasions to take possession of firearms and then sell them on VICKERS' behalf. ▮▮▮ also told investigators that James TAFOYA is a good friend and business partner.

72.     Upon the arrival of the lawyer, he and ▮▮▮ sat down with investigators to answer questions. ▮▮▮ advised investigators that VICKERS is part of an illegal network of machine-

gun collectors. ▋ would sell firearms for VICKERS, take a commission from the sale, and then would pay people at the request of VICKERS. ▋ also advised investigators that VICKERS had requested ▋ assistance in chopping up a collection of illegal firearms he had recently acquired. Once the firearms were deconstructed, the pieces would be sold as parts kits.

73. A search of ▋ residence resulted in the recovery of $220,000 in U.S. currency, believed to be the proceeds of illegal firearms transactions. ▋ also had upwards of seventy firearms in his residence. All firearms were properly registered with the ATF.

## ANALYSIS OF JONATHAN ▋ CELL PHONE AND COMPUTER

74. As noted above, Jonathan ▋ gave written consent to have his cell phone and computer forensically downloaded, copies of which were provided to case agents in the days following the execution of the search warrant. Upon analysis of his phone and computer, agents immediately realized there was a wealth of information stored in the pictures and messages ▋ had in the phone and computer; more specifically, there were thousands of messages with numerous people, spanning the past few years. Analysis of the messages between ▋ and TAFOYA confirmed what agents believed, insomuch as it was clear that ▋ and TAFOYA were using various Chiefs of Police or law enforcement entities, or their authorized representatives to provide fraudulent law letters so TAFOYA and others could import and/or transfer restricted firearms. These officials include but are not limited to a LEO 1 with the Bernalillo County Sheriff's Office in New Mexico, and LEO 2 with the Laguna Police Department in Laguna, New Mexico, and a Sergeant from the New Mexico State Police (▋), based out of Albuquerque, New Mexico. As previously mentioned, ▋ told investigators TAFOYA is a business partner of ▋. The business relationship is demonstrated throughout the conversation investigators

recovered from ██████ phone, as ██████ and TAFOYA continuously discuss acquiring, selling, and transferring firearms, through use of demonstration letters.  For example, investigators discovered the following text messages between TAFOYA and ██████, dating back to July 7, 2020, in which ██████ sent the following Demonstration letter template to TAFOYA (Highlights on the following document are from the original document):

April 10, 2020

ATTN:
Dealer
Address

To Whom It May Concern:

The *XXX Police Department* is requesting a demonstration of the following select-fire/automatic weapons for possible future purchase and use of our officers in the performance of their official duties.

1 x      San Swiss Arms/Sig Sauer AG, SG 551-2 LB SWAT, Cal. 5.56mm, Machinegun
1 x      San Swiss Arms/Sig Sauer AG, SG 553-1 LB, Cal. 5.56mm, Machinegun

The number of sworn full time officers in the *XXX Police Department* is (number of officers). These officers are authorized by law to make arrests and carry firearms in the performance of their official duties.

The firearms requested for demonstration is particularly suitable for use as a law enforcement weapons. The weapons requested are particularly suitable for law enforcement responses to active shooter situations which may occur in our jurisdiction.

Please direct all questions to *Chief Name of Chief* at email address or *phone number*.

Sincerely,

*Name of Chief*
Chief of Police

with the statement, "For the SIG's if you can get this to your chief in time"

TAFOYA: "I'll get them over to him tomorrow."

75.    This conversation shows that ███ would send a completed demonstration letter (minus the Law Enforcement Agency information and Police Chief name), with the types of firearms in the letter, to TAFOYA, who would then give the completed letter to the chief for signature (or his/her authorized representative), so the letter could be submitted to the ATF for approval.

76.    The following conversation between TAFOYA and ███, which dates back to December 2, 2020, outlines their scheme of importing or transferring restricted firearms:

    a.   ███ states, "Buddy of mine who is a police Sgt just texted me out of nowhere, $8000 each"

    b.   TAFOYA responds, "I'll call you back in just a few"

    c.   ███ then says, "Can I move 2 to BMC? And can you text or email [LEO 2] and have him add "Heckler & Koch MP7A2 4.6x30mm to ANY of the letters you sent"

    d.   ███ then texts, "Sent you an updated letter"

    (As previously mentioned in paragraph 8, investigators know LEO 2 to be employed with the Laguna Pueblo Police Department, and a former employee of the Bernalillo County Sheriff's Office. These text messages show that ███ and TAFOYA were having firearms added to demonstration requests for their own personal gain. The request for the Heckler & Koch MP7A2 was not actually intended for a demonstration to police department, as LEO 2 was not the genesis for the request of the firearm.)

77.    The ATF subsequently received a demonstration request letter from the Laguna Police Department, signed by LEO 2, by way of ██████████, on March 23, 2020. The

letter stated that ████████████ would be conducting the demonstration. With the approval of the request by the ATF, the weapons requested on the letter could then be transferred to ████████ (if they did not already have the firearms in their inventory), so they could conduct the demonstration for LEO 2.  The letter requested the demonstration of seventy-five (75) different models of firearms with a quantity of two (2) each.  In total, the letter requested one hundred and fifty (150) firearms.  Included in this letter were two (2) H&K MP7A2 machineguns, which investigators believe are the same firearms previously mentioned in the text conversation between ████ and TAFOYA.

78.    Further, the conversations between ████ and TAFOYA demonstrated they knowingly cooperated with each other to illegally import restricted firearms through the use of the law enforcement demonstration letters.   These letters were written on the letterhead of the Laguna Pueblo Police Department, the New Mexico State Police and the Bernalillo County Sheriff's Office to illegally import and transfer restricted firearms.   An interview of ████████ of the New Mexico State Police confirmed that the New Mexico State Police had no interest in purchasing any firearms outside of possibly a submachine gun platform for their tactical team.  Not only were they only looking at a submachine gun, ████ told investigators that he saw a demonstration of and was settled on a B&T submachine gun platform.  Furthermore, as noted in paragraph 88, the Chief of the New Mexico State Police, told investigators that there was no money in their budget to purchase firearms for the department nor had he approved any such purchase in theory, let alone in practice.

79.    Even with ████ settled on a B&T firearm for the tactical team proposal, the New Mexico State Police continued to make requests, and on June 15, 2021, they made a request through ████████ for one hundred and fifty (150) firearms.  Many of these firearms were

not suitable for law enforcement usage. For example, the request included second generation select fire Colt M16s, which I know from my training and experience to be an outdated weapons platform, but one that is desired by collectors. Another request submitted by the New Mexico State Police, again by way of ████████████, was to see a demonstration of eight (8) belt fed machine guns. A belt-fed machine gun is a weapon used in military combat but certainly not on the streets of a major American city. With the state police being interested in a submachine gun platform, none of these firearms would have met that criterion. However, these firearms are very profitable when sold to collectors or other FFLs and can typically only be imported or transferred to others with a demonstration request from a law enforcement agency, unless an FFL were to go out of business.

80. Additionally, there are extensive conversations between ██████ and SULLIVAN confirming that the two had engaged in conduct whereby they would import and transfer otherwise-prohibited firearms under cover of law enforcement demonstration letters for the purpose of bolstering their personal collections, or for resale to other persons across the country for financial gain (in the case of the HK MR308, for example, as mentioned above). For example, on April 5, 2020, the following conversation via text occurs between SULLIVAN and ██████:

    a. ██████: We will probably need to get that CZ805 in under a different name then what would be normal

    b. SULLIVAN: No issues

    c. ██████: Maybe just CZ805 or BREN805

    d. SULLIVAN: I used a different variant for ██████ on purpose

    e. ██████: Awesome, you're the best

    f. SULLIVAN: :805BRENA1" is already in the system

g. SULLIVAN: And different from the other one

h. SULLIVAN: I think that was "CZ BREN 805 A1" or something like that

i. ▮▮▮: Yes

81. Then on April 13, 2020, ▮▮▮ sends the following message to SULLIVAN:

a. ▮▮▮: Just want to verify verbiage:



[Date]

Mr. Sean Sullivan
Trident, LLC
1121 Annapolis Rd
Suite 198
Odenton MD 21113

Dear Mr. Sullivan:

Attached is a purchase order for:

- TWO (2) x CZ, "805BRENA1", Machinegun, Cal. 5.56x45mm

The firearm(s) will be used by *Dealer Name* in a demonstration of the firearm t
*the government department, office, or agency*). Attached is the letter of (*name
department, office, or agency*), dated (*date*), requesting the demonstration.

The firearm is particularly suitable for use as a law enforcement weapon for th
SWAT team when responding to active shooter situations in their jurisdiction.
currently in production by B&T, Switzerland, so quantities of the firearm are r
fill any subsequent orders for the firearm from (*name of the department, offi
asking for the demonstration*).

his demonstration is requested for the entire XXX SWAT team and therefor
nachineguns are requested as authorized under ATF Ruling 2002-5 for this s

ncerely yours,

ame of Dealer
tle

82.     The ATF then received a demonstration request letter from Laguna Police Department, dated April 20, 2020, requesting that ████████████ conducts a demonstration for the Laguna Police Department.  The letter was signed by LEO 2. Included in the request letter was the request for Two (2) CZ "805BRENA1", Machinegun, Cal. 5.56x45mm.  The ATF then received a Form 3 (Transfer of Firearm Form) on November 17, 2020, from Trident LLC and signed by Sean SULLIVAN, for the transfer of an imported "805BRENA1" machinegun bearing serial number B278874, to ████████████.

83.     Based on the conversation between █████ and SULLIVAN, and further supported by the demonstration request submission and Form 3 transfer, investigators were able to piece together the conspiracy to illegally import a firearm. The text messages show SULLIVAN and █████ renamed the firearm, in order to receive approval from the ATF to import the firearm into the United States because it appears they believed that ████████████ already had a CZ Bren in the system and, as such, ATF would normally deny an import request by an FFL if they already had the same make and model in their inventory. To remedy that problem in this instance they had to create up a new model so the import would be allowed. The agreed upon name was then confirmed on the demonstration request template that █████ sent to SULLIVAN.  Then, either the completed template or the verbiage from the template was sent to LEO 2 for his signature.  In either case, the signed demonstration request letter made its way to ████████████ for subsequent submission to the ATF.  After the ATF approved the demonstration request for the Laguna Police Department, ████████████ requested that Trident LLC import the otherwise prohibited firearm, following which Trident LLC transferred the firearm to █████ Weapons.

84.     All told, █████ had thousands of text messages between himself and conspirators, both known and unknown, many of which referenced the scheme to fraudulently import and

transfer restricted firearms in violation of federal firearms laws and to profit financially from the import and resale of otherwise-impermissible regulated firearms.

85. A further review of ███████ computer revealed multiple demonstration requests for law enforcement agencies to include the New Mexico State Police. Some of these letters had not yet even been sent to the ATF, however, they were complete, save for the signature of the law enforcement officer who would be authorizing the request. ██████, having unsigned request letters on official law enforcement letterhead on his computer, further shows his participation in the creation of fraudulent demonstration requests for different law enforcement agencies. Investigators believe the fact that ██████ had draft versions of demonstration requests further confirms that ██████ was the actual genesis for the request rather than the law enforcement agency wishing to purchase the firearms, which is improper. The lawful chain of events should start with the law enforcement agency identifying a particular firearm or firearms that they would like demonstrated in order to purchase them at some point in the future, at which time they would prepare a request letter for an FFL of their choosing. The following are two separate demonstration request letters recovered from ██████ computer, which investigators believe had not yet been submitted to the ATF, nor even seen by ██████ of the New Mexico State Police:



# New Mexico
## Department of Public Safety

MICHELLE LUJAN GRISHAM
GOVERNOR

JASON R. BOWIE
CABINET SECRETARY DESIGNATE

TIM Q. JOHNSON
CHIEF / DEPUTY SECRETARY

W. TROY WEISLER
ACTING DEPUTY SECRETARY

September 1, 2021



Integrity Firearms

8000 Paseo Del Norte BLVD NE, STE C6

Albuquerque, NM 87122

Dear ,

The New Mexico Department of Public Safety (NMDPS) / New Mexico State Police Department is requesting a demonstration by representatives of Integrity Firearms of the following machine guns for possible future purchase and use by our officers in the performance of their official duties:

**Heckler & Koch MP7A1 4.6x30mm    Heckler & Koch MP7A2 4.6x30mm    Heckler & Koch MP5N 9mm Colt M16A3 5.56mm    Heckler & Koch MP5A2 9mm    Heckler & Koch MP5A3 9mm**

**Colt M4 5.56mm    Colt M16A2 Commando 5.56mm    Colt M16A2 5.56mm**

**Bushmaster XM15E2S .223 Cal    Colt M16A2 / SMG 9mm**

This demonstration is requested for the entire New Mexico State Police Department and the number of sworn officers in our department is six-hundred thirty-five (635) as well as 22 SWAT Team members.

The New Mexico State Police Department is requesting a total of **TEN (10)** of each specific model of machine gun due to the number of officers participating in the demonstration as well as range time availability.  Additional demonstration weapons will be useful in the event of breakage or malfunction, as well as preventing overheating due to full auto fire.  These weapons will be used to demonstrate their effectiveness and suitability with tactical entry teams consisting of several officers.

These weapons will also be used in side-by-side course-of-fire drills involving multiple officers whereby weapons of the same model will be configured differently to demonstrate their applications to different situations officers may encounter.  Examples of these configurations include, but are not limited to, iron sights vs optics, different styles of optics, and suppressed and unsuppressed.

The firearms requested for demonstration are particularly suitable for use as law enforcement weapons as they fit the department requirement for cost, availability, and use in day to day patrol, as well as special operations.

44

The telephone contact number for this office is 505-660-5888.

Respectfully,

████████████, Armorer
New Mexico State Police Department



**JASON R. BOWIE**
CABINET SECRETARY DESIGNATE

**TIM Q. JOHNSON**
CHIEF / DEPUTY SECRETARY

**W. TROY WEISLER**
ACTING DEPUTY SECRETARY

September 1, 2021

JCT Firearms, LLC

Mr. James C. Tafoya

207 Old Coors DR SW

Albuquerque, NM 87121

Dear Mr. Tafoya,

The New Mexico Department of Public Safety (NMDPS) / New Mexico State Police Department is requesting a demonstration by representatives of JCT Firearms, LLC of the following machine guns for possible future purchase and use by our officers in the performance of their official duties:

**Heckler & Koch MP7A1 4.6x30mm    Heckler & Koch MP7A2 4.6x30mm    Heckler & Koch MP5N 9mm Colt M16A3 5.56mm    Heckler & Koch MP5A2 9mm    Heckler & Koch MP5A3 9mm**

**Colt M4 5.56mm    Colt M16A2 Commando 5.56mm    Colt M16A2 5.56mm**

**Bushmaster XM15E2S .223 Cal    Colt M16A2 / SMG 9mm**

This demonstration is requested for the entire New Mexico State Police Department and the number of sworn officers in our department is six-hundred thirty-five (635) as well as 22 SWAT Team members.

The New Mexico State Police Department is requesting a total of **TEN (10)** of each specific model of machine gun due to the number of officers participating in the demonstration as well as range time availability.  Additional demonstration weapons will be useful in the event of breakage or malfunction, as well as preventing overheating due to full auto fire.  These weapons will be used to demonstrate their effectiveness and suitability with tactical entry teams consisting of several officers.

These weapons will also be used in side-by-side course-of-fire drills involving multiple officers whereby weapons of the same model will be configured differently to demonstrate their applications to different situations officers may encounter.  Examples of these configurations include, but are not limited to, iron sights vs optics, different styles of optics, and suppressed and unsuppressed.

The firearms requested for demonstration are particularly suitable for use as law enforcement weapons as they fit the department requirement for cost, availability, and use in day to day patrol, as well as special operations.

The telephone contact number for this office is 505-660-5888.

Respectfully,

████████████, Armorer
New Mexico State Police Department

86.    The two demonstration requests are identical, aside from the FFL conducting the

demonstration.  As noted in the two requests, the FFLs are JCT Firearms (now JCT Manufacturing)

and Integrity Firearms. Investigators believe ████ created these demonstration letters unbeknownst to the New Mexico State Police, and more specially ████, as there would be no reason for ████ to request a demonstration of the same firearms by two different FFLs.

87.     Based on the information found in ████ electronics, it is apparent that he was writing the letters either himself or in conjunction with TAFOYA before they would send them to ████ (as outlined in more detail below) to have him (████) have the law enforcement officers sign them; recently the majority of the requests were to be routed through ████████.

### INTERVIEWS OF NEW MEXICO FFLS AND NEW MEXICO STATE POLICE

88.     Both before, and after the execution of the federal search warrant at ████ residence, investigators conducted multiple phone interviews with various individuals in New Mexico. One of the individuals interviewed was ████████████████ ████. Through multiple interviews with ████████, investigators confirmed that the New Mexico State Police did not carry any fully automatic firearms, nor was he aware of any request to purchase any new firearm platforms for the department as the funding for the state police was limited. ████ further told investigators that while he was not a gun expert by any means, he readily acknowledged belt fed machineguns are not an appropriate or suitable firearm for the department.

89.     On September 30, 2021, investigators interviewed an employee of the New Mexico State Police, ████████. As mentioned previously, ████████ is the current armorer for the state police and, was granted the authority to make firearm demonstration requests as the armorer for the department. ████ told investigators that he was looking to upgrade the firearms for the tactical team to a submachine gun platform, and that was why he had made firearm

demonstration requests. ▇▇▇▇ stated that he had selected JCT Manufacturing and ▇▇▇▇ ▇▇▇▇ as the FFLs to conduct the demonstrations because they were local shops. ▇▇▇▇ said that no purchases had been made yet, and that he had not yet submitted the proposal to purchase new firearms through his chain of command. Investigators asked ▇▇▇▇ what his process was for submitting the demonstration request. ▇▇▇▇ told investigators that he would tell ▇▇▇▇ what types of firearms he wanted to see demonstrated, and then ▇▇▇▇ would eventually tell him what kind of firearms could be demonstrated. ▇▇▇▇ went on to say that ▇▇▇▇ would tell him he could bring him a certain type of firearm to be demonstrated and would ask if ▇▇▇▇ would like to see it demonstrated. ▇▇▇▇ stated that all the demonstration letters he had signed were suggested by ▇▇▇▇. ▇▇▇▇ also went on to say that he was provided with the verbiage that was needed for the letter.

90. Investigators then asked ▇▇▇▇ why he submitted a request for one hundred and fifty (150) firearms on June 15, 2021. The request was for fifteen (15) different models of firearms with a quantity of ten (10) for each model to be demonstrated. ▇▇▇▇ told investigators he did not remember why he had requested that many. Investigators also asked ▇▇▇▇ about his request for eight (8) belt fed machine guns on June 1, 2021. ▇▇▇▇ stated that ▇▇▇▇ told him the Louisiana State Police use those firearms as mounted machine guns on their patrol boats. ▇▇▇▇ said the firearms were requested just to try them out, as the New Mexico State Police did not have patrol boats nor a need for belt-fed weaponry. ▇▇▇▇ went on to tell investigators that ▇▇▇▇ gave him the impression that it was alright to request firearm demonstrations just to see them for familiarization purposes. Investigators then asked ▇▇▇▇ how many belt-fed machineguns were recovered in New Mexico on a yearly basis, to which ▇▇▇▇ had no answer. Finally, ▇▇▇▇ advised

that he trusted ▊ as a credible source and believed what he was telling him to be true due to ▊ former career as an Industry Operations Inspector for the ATF.

91.     Investigators conducted a follow up interview of ▊ on October 4, 2021. Investigators again asked ▊ to explain the process he used for submitting the demonstration request letters to the ATF. ▊ advised that he only dealt with ▊ for submission of the demonstration requests. ▊ told investigators that ▊ would tell ▊ how to write the letters. ▊ would tell ▊ what he wanted to see for demonstrations, and ▊ would get back to ▊ at a later time with what firearms he could provide for demonstrations. ▊ would then send a completed demonstration request letter to ▊ for his signature. As the interview progressed, ▊ eventually told investigators he provided ▊ with blank New Mexico State Police letter head for him (▊) to write the demonstration letter. ▊ would then bring back a completed demonstration letter request on the letterhead, which ▊ would sign. ▊ believed ▊ would then submit the letter to the ATF on the behalf of the New Mexico State Police. ▊ told investigators, outside of the four submachine gun platforms he wanted to try out for the tactical team, the only firearm he had personally wanted to see demonstrated was an AK47, and that was purely for his own enjoyment.

92.     Along with the interviews of ▊, investigators conducted multiple interviews with ▊, co-owner and operator of Integrity Firearms (**Location 4**). ▊ currently resides at **Location 5**, which investigators know based on factors described in more detail below. The first interview of ▊ occurred on September 30, 2021, wherein ▊ told investigators that he previously worked for the ATF in Albuquerque as an industry operations inspector for over a decade. After leaving his position with the ATF in April 2021, he became a FFL and partnered with TAFOYA as they opened Integrity Firearms. ▊ also did work for

both JCT Manufacturing and ████████████, due to his expertise in the industry. ████ told investigators that following the federal search warrant execution at ████ residence, he was informed by TAFOYA that there might be issues with the validity of the demonstration request letters both JCT Manufacturing and ████████████ had been submitting on behalf of the New Mexico State Police.

93. When asked if ████ helped create the demonstration letters, ████ told investigators that he never helped ████ with the demonstration requests. ████ went on to tell investigators that his role regarding the demonstration requests was mainly with the actual demonstration of the firearms on a firing range to the respective police departments. ████ further stated that someone does give ████ the verbiage for the requests, but he was not sure who that is. He also stated that ████ would source the firearms for the requests and would tell ████, TAFOYA, and ████, what firearms were available for demonstration. ████ reiterated that he never gave information to ████ for the letters, and that ████ thought demonstrations could be conducted simply for familiarization, in addition to the possible future purchase.

94. Investigators then conducted two follow up interviews with ████ on October 1, 2021, and October 4, 2021, regarding his role with JCT Manufacturing, ████████████, and the demonstration of firearms to the New Mexico State Police. ████ again told investigators that he did not give ████ any information for the demonstration request letters. However, ████ did inform investigators that he brought the demonstration request letters to ████████ for ████ s signature. Investigators asked ████ to explain how that process would occur, as investigators know the proper process for the creation of a demonstration request letter is for the police agency to create the request, sign the letter, and then submit it to the FFL they are requesting to acquire the firearms and conduct the demonstration of same.

95.      ███      told investigators that ███████ would request firearms that ███ and ███ had previously discussed.   ███   would then tell TAFOYA that the New Mexico State Police are looking for a particular firearm demonstration for familiarization.  From there, TAFOYA would send a message to ███ , telling ███ the New Mexico State Police wanted to see a particular firearm.   ███   would then get a completed demonstration letter with a list of firearms from TAFOYA, who he believed received the letter from ███ .   ███   would then bring the completed letter to ███ for his signature, and then the letter would be submitted to the ATF for approval.  After ███ explained the process to investigators, ███ went on to tell investigators that looking back at the process they (███ , TAFOYA, ███ , and ███ ) were using for the letters, he could see how it looked problematic to investigators.

96.      On October 4, 2021, investigators also conducted an interview of James TAFOYA, the owner of JCT Manufacturing (**Location 1**), and co-owner of Integrity Firearms (**Location 4**). TAFOYA resides at **Location 2** (12101 Signal Ave NE, Albuquerque, New Mexico 87122). TAFOYA had previously sent multiple text messages to one of the investigators, showing pictures and videos of the New Mexico State Police shooting different firearms at an unknown range. Investigators asked why TAFOYA had sent those messages, as they came in seemingly unprompted.  TAFOYA told investigators he had heard the ATF had been to ███████ residence and was concerned.  TAFOYA stated that ███████ used TAFOYA's cell phone to send some of the messages.  He went on to say he had a feeling there might be an issue with the recent demonstration request letters from JCT Manufacturing and ███████ for the New Mexico State Police, although he demurred on saying what might have caused him to have concern regarding the demonstration letters specifically.

97.     During the course of the interview, TAFOYA told investigators, ███████████, owner of ███████████ (**Location 3**), no longer had time to operate his business as a FFL, and therefore decided to go out of business.  Investigators know that over the past few months the ATF had received multiple demonstration requests from ███████████, which included over 150 firearms on one request and belt-fed machineguns on another as previously mentioned (the majority of which were unsuitable for law enforcement).  Investigators found these large requests odd if a plan to go out of business was indeed in place because to conduct the demonstration, the FFL must purchase the firearm which then creates a larger inventory of firearms for the FFL. Also, they would be laying out a significant amount of money to acquire all of the requested firearms on the hopes that the agency testing the weapons would decide to purchase them. But, as previously mentioned in paragraph 70, investigators were aware ███████ was helping facilitate ███████ to go out of business, just as he had done with other FFLs.  Similar to those other FFLs, an increase of their inventory with rare, exotic, and expensive firearms was taking place, just before ███████ was planning to go out of business.  The economic benefit of selling these restricted firearms to other FFLs or private collectors far exceed any profits which would be generated from the sale of those same firearms to a law enforcement agency.

98.     TAFOYA went on to tell investigators that ███████ from the New Mexico State Police had been requesting demonstrations. According to TAFOYA, ███████ had seen a demonstration of B&T submachineguns over the summer of 2021 and was placing an order for those firearms.  TAFOYA stated that he and ███████ conducted that demonstration.  Investigators asked TAFOYA to explain the process by which they would conduct the demonstrations. TAFOYA explained that ███████ came to TAFOYA with certain types of firearms that the New Mexico State Police would like to see demonstrated.  TAFOYA would then see what type of

firearms he could get through ███████████. ██████ would then source the firearms needed for the demonstrations. According to TAFOYA, █████ is a broker for him. For example, if the state police wanted to see a submachine gun type firearm, TAFOYA would ask █████ what platforms are available, and then TAFOYA would let the state police know what █████ had located. The state police would then be able to write the demonstration letter accordingly. TAFOYA told investigators that he believed demonstrations could be conducted solely for familiarization purposes, and not just for potential future purchase.[8]

## THE SUBJECT PREMISES

99.     Investigators know that TAFOYA, █████, and █████ utilize **Location 1**, **Location 3**, and **Location 4** as their business locations. They know this because TAFOYA, █████, and █████, listed **Location 1**, **Location 3**, and **Location 4** on paperwork submitted to the ATF. Currently in the Federal Licensing System (FLS) which is kept by the ATF, **Location 1** is listed as the business location for JCT Manufacturing, **Location 3** is listed as the business location for ███████████, and **Location 4**, is listed as the business location for Integrity Firearms. Additionally, on June 14, 2021, an ATF inspection of Integrity Firearms was conducted. During the inspection, the inspector interviewed both █████ and TAFOYA, as they are the two listed owners of Integrity Firearms. During the inspection and interview, a residential address was provided for both █████ and TAFOYA. TAFOYA's residential address was confirmed as 12101 Signal Ave NE, Albuquerque, New Mexico 87122, **Location 2**, and █████ residence was confirmed as ████████████████████████████, **Location 5,** which also matches the address listed on his New Mexico Driver's License. Your affiant believes, based

---

[8] Investigators are aware some demonstrations of firearms were conducted for Sgt. ████ of the New Mexico State Police. Investigators are not aware of any purchases ever made by the state police for the demonstrated firearms. Furthermore, there was never any proposal even submitted to the Chief of Police to consider a future purchase of firearms.

on ATF record-keeping requirements and industry practices, that FFLs maintain their inventories and transaction records at their businesses and in their homes.

## **CONCLUSION**

100.    Based on interviews with TAFOYA, ███ ███ and ███ as well as information uncovered by the investigation to date from ███ and VICKERS' electronics, agents concluded that TAFOYA, ███, ███, and ███ did acquire and place in inventory restricted firearms through the use of fraudulent demonstration letters; those letters were sourced from ███ at the New Mexico State Police, LEO 2 of the Laguna Police Department, and LEO 1 of the Bernalillo County Sheriff's Office.    Furthermore, investigators believe that TAFOYA, ███, ███, and ███ realized that by going out of business (thus removing the law letter requirement) they could sell said inventories to any SOT holding FFL for significant amounts of money, a practice ███ specialized in. For point of emphasis, TAFOYA had recently gone out of business and liquidated his inventory, VICKERS had recently gone out of business and liquidated his inventory, and ███ had recently filed an out of business letter with the ATF in August 2021 stating that he would liquidate his inventory within 90 days of the date on his letter. The money to be made form these liquidations is obviously based somewhat on the number and type of guns being sold, but agents know from their investigation that the proceeds can run into the millions of dollars.

101.    The above information provided investigators with the evidence that demonstrates the conspiracy between TAFOYA, ███, ███, and ███ to fraudulently produce demonstration letters in violation of USC 924(a)(1)(a), which in turn created a violation of USC 922(l) the importation of a prohibited firearm and related offenses (**Subject Offenses**).

102.     Based on my training and experience, I know that business owners will take business records, laptops, other documents, and electronics, etc., from work to home and home to work, to be able to have access to their work documents as needed to be able to conduct business outside normal business hours.  More specific to JCT Manufacturing, █████████████, and Integrity Firearms as FFLs, investigators know that JCT Manufacturing had a break in during the summer of 2020, in which over one hundred (100) firearms were stolen.  Based on that information, investigators believe that currency, electronics, and records, would be brought home regularly to ensure minimum losses should a break in occur at one of their businesses.  JCT Manufacturing and Integrity Firearms also have on-line websites, which investigators know can be maintained virtually from both home and from the business through the use of a computer or cell phone.

103.     Based on the foregoing information, I submit that probable cause exists that James C. TAFOYA, █████████████, ██████████, and ██████████ have committed violations of the **Subject Offenses** and that there is probable cause to search **Location 1**, **Location 2**, **Location 3**, **Location 4**, and **Location 5**, as described in **Attachment A-1** through **A-5**, for evidence, fruits, and instrumentalities of these crimes, as further described in **Attachment B**.

104.     Therefore, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for **Location 1**, **Location 2**, **Location 3**, **Location 4**, and **Location 5**, and authorize the search and the seizure of the items described in **Attachment B**, which constitute fruits, evidence, and instrumentalities of violations of the **Subject Offenses**.

105.     Under penalty of perjury, I swear that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____

Special Agent James A. Nugent
Bureau of Alcohol, Tobacco, Firearms & Explosives


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this __26th__ day of November 2021.

_____

Hon. Steven C. Yarbrough
United States Magistrate Judge

**ATTACHMENT A -1**

**Property to be Searched**





207 Old Coors DR SW, Albuquerque, New Mexico, 87121, is a one-story commercial building for a firearms business. The building has one window in the front of the building, with black bars securing the window. There is one glass front door, and one brown colored front door. The front of the building is comprised of red brick coloring and beige color. There is a large sign on the front of the building which states "JCT Firearms 207 Old Coors SW Albuquerque, New Mexico". A black colored fence separates the front of the building and the parking lot, from the back half of the property. The property in the back may include but not limited to additional storage facilities, garage(s), sheds, and locked containers. One structure in the back which can be seen from the street, is beige colored with white trim along the roof.

# ATTACHMENT A-2

## Property to be Searched



**ATTACHMENT A-3**

**Property to be Searched**





211 Old Coors DR SW, Albuquerque, New Mexico, 87121, is a one-story commercial space, utilized as a firearms business.  There are white bars securing three windows on the front of the building.  There are white colored, single doors on both sides of the building.  The building is beige in color, with a gray roof and white trim along the roof.  There is a fence separating the front parking lot from the back area of the property.  The property in the back may include but not limited to additional storage facilities, garage(s), sheds, and locked containers.  One building in the back which can be seen from the street, has a large white garage door, with white trim along the gray roof.

**Property to be Searched**



# ATTACHMENT A-5

## Property to be Searched



# ATTACHMENT B

## Particular Things to be Seized

Items constituting evidence, fruits, proceeds, and instrumentalities of violations of 18 U.S.C. § 922(l), 18 U.S.C. § 371, and related offenses, hereinafter referred to as the **Subject Offenses**, including but not limited to the following:

1.      Any firearm as defined by 18 U.S.C. §921(a)(3) or 26 U.S.C. §5845(a). **The searching agents may examine all firearms to determine if each firearm is lawfully possessed, leaving the firearms legally possessed with the owner(s) thereof and seizing all illegal firearms and components;**

2.      Any firearm that does not have a lawful manufacturer stamp and serial number, any unregistered firearm (where registration is required by Title 26 of the United States Code), and variant lower receivers of any kind;

3.      Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and machinegun conversion kits;

4.      Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, molds, molding equipment, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

5.      Currency or currency equivalents exceeding $10,000;

6.      Any and all records, logs, documents, advertisement fliers, class schedules, attendance sheets and other documents related to the formation and operation of firearms and tactical classes.

7.      Any emails, documents, records, financial records, or other correspondence, in paper or electronic format, relating to the importation of firearms into the United States;

8.      Any emails, documents, records, financial records, or other correspondence, in paper or electronic format, relating to TRIDENT LLC and/or Sean Reidpath SULLIVAN;

9.      Any emails, documents, records, financial records, or other correspondence, in paper or electronic format, relating to VICKERS TACTICAL, VT GUNS, and/or Larry Allen VICKERS;

10.      Any emails, documents, records, financial records, or other correspondence, in paper or electronic format, relating to ███████████, and/or ███████████;

11.      Records of firearms transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of proceeds derived from the sale of illegal or illegally purchased firearms;

12.     Financial records and other records or documents reflecting firearms-trafficking activity or the disposition of firearms proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit cards; credit card records; pre-paid credit cards; green dot cards and documents relating thereto; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal firearms; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal firearms sales;

13.     Records that identify other co-conspirators and/or supplier(s) of any item in paragraphs (1) through (3) above, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones/cellphones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

14.     Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

**15.**     Identification documents, including passports and other travel documents; **The searching agents will be permitted to photograph identification documents, including passports and other travel documents, while leaving the original documents with the lawful owners.**

16.     Records of travel including, but not limited to, tickets, transportation schedules, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

17.     Indicia of occupancy, residency, rental, control, and/or ownership of the premises/vehicle, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

18.     Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof; and cellphones and related records and equipment; and

19.     Any cell phones, computer, laptops, hard drives or other electronic media storage capable of containing any of the records and/or documents referenced in the above paragraphs.

THE ELECTRONIC DEVICES DESCRIBED ABOVE WILL BE QUARANTINED AND SECURED BY THE INVESTIGATING AGENCIES AND ADDITIONAL WARRANTS WILL BE SOUGHT IN CONNECTION WITH THE SEARCH OF SAID DEVICES.